## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ERIC GUNNAR BERG,　　　　　　§
(TDCJ-CID #1210028)　　　　　　　§
　　　　　　　　　　　　　　　　§
　　　　　　Petitioner,　　　　　§
　　　　　　　　　　　　　　　　§
VS.　　　　　　　　　　　　　　§　　CIVIL ACTION NO. H-09-0423
　　　　　　　　　　　　　　　　§
RICK THALER,　　　　　　　　　§
　　　　　　　　　　　　　　　　§
　　　　　　Respondent.　　　　　§

## MEMORANDUM AND OPINION

The petitioner, Eric Gunnar Berg, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging two 2003 state felony convictions for aggravated sexual assault of a child. The respondent filed an answer to the petition and a motion to dismiss, (Docket Entry No. 10), with a copy of the state court record. Berg, with the assistance of counsel,[1] filed a response. (Docket Entry No. 11). Based on careful consideration of the pleadings, the motion and response, the record, and the applicable law, this court grants the respondent's motion and, by separate order, enters final judgment. The reasons are explained below.

## I.　　Background

Berg was charged with aggravated sexual assault of a child in Cause Number 945666. The indictment alleged:

> In the name and by authority of the State of Texas:  The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, Eric

---

[1] Randy Schaffer represented Berg during state habeas proceedings and in this federal habeas proceeding.

> Gunnar Berg, hereafter styled the Defendant, heretofore on or about September 1, 2002, did then and there unlawfully, intentionally and knowingly cause the sexual organ of [G.L.], a person younger than fourteen years of age and not the spouse of the Defendant, to penetrate the mouth of Eric Gunnar Berg.  Against the peace and dignity of the State.

*Ex parte Berg,* Application No. 70,560-02 at 158.

Berg was also charged with aggravated sexual assault of a child in Cause Number 945667.

The indictment alleged:

> In the name and by authority of the State of Texas:  The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, Eric Gunnar Berg, hereafter styled the Defendant, heretofore on or about January 1, 2003, did then and there unlawfully, intentionally and knowingly cause the anus of [G.L.], a person younger than fourteen years of age and not the spouse of the Defendant, to contact the sexual organ of Eric Gunnar Berg.  Against the peace and dignity of the State.

*Ex parte Berg,* Application No. 70,560-01 at 160.

Berg pleaded guilty to both felony offenses and elected to have the jury assess his punishment. (Cause Numbers 945666 and 945667).  On October 28, 2003, the jury sentenced Berg to 35 years in prison for each offense.  The court granted the prosecutor's motion to stack the sentences, running them consecutively.  The First Court of Appeals of Texas affirmed Berg's convictions on February 17, 2005. *Berg v. State,* Nos. 01-03-01140-CR, 01-03-01141-CR, 2005 WL 375346 (Tex. App. -- Houston [1st Dist.] 2005, pet. ref'd) (not designated for publication).  On December 14, 2005, the Texas Court of Criminal Appeals refused Berg's petitions for discretionary review.

Berg filed applications for state habeas corpus relief on February 28, 2007. On state habeas review, Berg's trial counsel, Don Becker, submitted an affidavit at the request of habeas counsel, Randy Schaffer. *Ex parte Berg,* Application No. 70,560-01 at 34; *Ex parte Berg,* Application No. 70,560-02 at 34. Becker submitted a supplemental affidavit at the request of a prosecutor with the Harris County District Attorney's Office. *Ex parte Berg,* Application No. 70,560-01 at 95; *Ex parte Berg,* Application No. 70,560-02 at 91. The habeas court conducted a hearing on August 9, 2007 to address the inconsistencies in the two affidavits Becker submitted. *Ex parte Berg,* Application No. 70,560-01 (Event ID 2342830) at 1-117; *Ex parte Berg,* Application No. 70,560-02 (Event ID 2342832) at 1-117. On August 12, 2008, the trial court entered detailed findings of fact and conclusions of law. On February 4, 2009, the Texas Court of Criminal Appeals denied relief without written order, on the findings of the trial court. *Ex parte Berg,* Application No. 70,560-01 at cover; *Ex parte Berg,* Application No. 70,560-02 at cover.

On February 12, 2009, this court received Berg's federal petition. Berg contends that his convictions are void because his trial counsel, Don Becker, rendered ineffective assistance by:

(1)     eliciting information prejudicial to Berg during the voir dire examination;

(2)     calling Berg and his psychologist to testify; and

(3)     arguing during summation that Berg had committed "the worst crime of all."

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, p. 2). Each allegation is examined under the legal standard and that applies.

## II.     The Applicable Legal Standards

This court reviews Berg's petition for writ of habeas corpus under the federal habeas statutes as amended by the Antiterrorism and Effective Death Penalty Act of 1996. 28 U.S.C. § 2254; *Woods*

*v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d 409, 413 (5th Cir. 1997),

citing *Lindh v. Murphy*, 521 U.S. 320 (1997).  Subsections 2254(d)(1) and (2) of the AEDPA set out

the standards of review for questions of fact, questions of law, and mixed questions of fact and law

that result in an "adjudication on the merits."  An adjudication on the merits "is a term of art that

refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller*

*v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).

The AEDPA provides as follows, in pertinent part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1)  In a proceeding instituted by an application for a  writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

A federal court may not issue a writ of habeas corpus for a state inmate unless the state

court's adjudication of his claim "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States."  28 U.S.C. § 2254(d)(1).  The legal application must be "objectively

unreasonable," which is more than merely "erroneous or incorrect." *Williams v. Taylor,* 529 U.S.

362, 409, 411 (2000) (internal quotation marks omitted); *Tucker v. Johnson,* 242 F.3d 617, 620 (5th Cir. 2001). A decision unreasonably applies clearly established law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams,* 529 U.S. at 407-08. The focus of this objective reasonableness inquiry is on the state court's ultimate decision, not whether the state court "discussed every angle of the evidence." *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc).

In addition, a state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

## III.    Background

### A.    The State's Case-in-Chief

At the punishment phase of trial, the complainant, G.L., testified that he was 13 years old and in the 8th grade when the events at issue occurred. Berg was G.L.'s stepfather's uncle. (Reporter's Record, Vol. IV, pp. 9, 20). G.L. testified that he spent a lot of time alone with Berg. They rented movies, went bowling, or took trips out of town. (*Id.* at 9). When G.L. was 10 years old, Berg began sexually abusing him. (*Id.* at 11). Berg undressed G.L. and put his mouth and hands on G.L.'s penis. (*Id.* at 12-15). G.L. testified that Berg would promise to take him places if he allowed the touching.

(*Id.* at 12).  Berg showed G.L. pornographic movies and internet images of males having sex with other males.  (*Id.* at 14).

G.L. testified that he brought his 10-year-old friend, D.F., to Berg's house.  Berg touched G.L. when D.F. was in the room.  (Reporter's Record, Vol. IV, p. 14).  Berg also touched D.F.'s penis and put his mouth on D.F.'s penis.  (*Id.* at 15).  Berg told G.L. to touch D.F.  (*Id.* at 29, 33-34).  This happened about ten times.  (*Id.* at 29).  G.L. never told Berg to stop because G.L. was scared.  G.L. testified that Berg never threatened him.  (*Id.* at 15).  G.L. testified that he would touch Berg's genitals even without Berg instructing him.  G.L. testified that he felt disgusted and angry at Berg.  (*Id.* at 17).

D.F. was also 13 and in the 8th grade.  D.F. testified that he first met Berg through G.L. when D.F. was 10 years old.  D.F. testified that when he went to Berg's house, Berg would touch his genitals.  (Reporter's Record, Vol. IV, pp. 35-36).

Mary Virginia Wright, G.L.'s mother, testified that her ex-husband, James Wright, lived with Berg when he was a teenager and that Berg raised him.  (Reporter's Record, Vol. IV, p. 41).  She married James Wright when G.L. was 10 years old.  G.L. began having contact with Berg at that time.  (*Id.* at 41-42).  Mary Wright testified that she thought of Berg as a family member.  (*Id.* at 42).  On March 7, 2003, Mary Wright learned that G.L. had "acted out" with James Wright's four-year-old nephew.  She talked to G.L. about this.  (*Id.* at 44).  G.L. told her that Berg had touched him, tried to penetrate him, performed oral sex on him, and shown him pornographic websites.  (*Id.* at 15, 44).  G.L. said that while he was laying on the couch at Berg's house one day, Berg tried to penetrate him with his penis.  G.L. told Berg that it hurt, and Berg stopped.  (*Id.* at 45).  Mary Wright called

the police and called D.F.'s father. (*Id.* at 45, 50). She testified that G.L. was not ready to talk about what had happened to him.

Harvey Paul, D.F.'s stepfather, testified that D.F. was embarrassed and did not want to talk about Berg. D.F. confirmed the allegations but gave no detailed explanation of what had happened. (Reporter's Record, Vol. IV, p. 49, 50).

Dr. Lawrence Thompson, Jr., a clinical psychologist at the Children's Assessment Center, testified. The Center treats victims of child sexual abuse and their families. Dr. Thompson testified that he reviewed the records relating to Berg and explained how Berg used an approach called "grooming." Child sexual abusers use "grooming" to get close to children, then abuse them. (Reporter's Record, Vol. IV, p. 56). Dr. Thompson explained that children often want to spend time with their abusers. (*Id.* at 60). He testified that there is no cure for sexual offenders and an abuser must actively participate in therapy or it is ineffective. (*Id.* at 61).

## B.     The Defense Case-in-Chief

Dr. Nicholas Edd, a psychologist in private practice and a registered sex-offender treatment provider, testified that Berg came in for treatment in March 2003. Berg had been participating in treatment through individual and group therapy for ten months. (Reporter's Record, Vol. V, p. 4). Dr. Edd testified that Berg attended and participated in all the sessions. (*Id.* at 11). Berg had also consulted with Dr. Barbara Levinson and was receiving treatment from her as well. (*Id.* at 5). Dr. Edd explained that if during therapy he learned of any sex crimes, he was required to report them to the police. Patients are advised of this requirement. Dr. Edd testified that before beginning therapy, patients are required to sign a contract prohibiting them from having contact with children. Berg had two violations of his contract. Berg had attended a function with some friends and allowed a nine-

year-old boy to sit on his lap. (*Id.* at 7).  Berg also allowed G.L.'s father to come to Berg's

house with a nine-month-old infant.  (*Id.*).  Berg reported the incidents to Dr. Edd.  (*Id.*).  Berg

also reported his past sexual offenses.  Dr. Edd testified that Berg reported that beginning when he

was six, he had been sexually abused by a male neighbor.  (*Id.* at 8).

Dr. Edd testified that Berg had a high level of participation in therapy.  Participation in

treatment increases the likelihood that a person will not re-offend.  (Reporter's Record, Vol. V, p.

11).  Dr. Edd testified that Berg had shown considerable remorse.  He was taking medication for

depression.  (*Id.* at 13).  Dr. Edd testified that Berg had a significant degree of psychosocial and

developmental maladjustment that could be treated.  His prognosis for a person like Berg, who had

a long history of abuse, was guarded.  (*Id.* at 18).  Dr. Edd agreed with Dr. Thompson that a sex

offender cannot be cured.  The goal of therapy and counseling is that there be no more victims and

to decrease the chances of re-offending.  (*Id.*).

On cross-examination, Dr. Edd testified that during sessions, Berg admitted to having five

victims. (Reporter's Record, Vol. V, p. 19).  When Berg was 18, he abused his 12-year-old nephew.

(*Id.* at 19-20).  Berg admitted to performing oral sex and having anal intercourse with that victim.

(*Id.* at 20).  Berg also admitted to sexually abusing a 12-year-old boy who lived with Berg for a

while. (*Id.*).  Berg admitted that he "made a move" on James Wright but was rebuffed.  (*Id.* at 21).

Berg admitted to abusing G.L. and D.F.  (*Id.*).  Dr. Edd testified that there could be other victims.

(*Id.* at 36).  Dr. Edd testified that Berg felt like a victim and had thought having sex with his child

victim was appropriate.  Dr. Edd testified that Berg had admitted having fantasies about young boys.

(*Id.* at 25).  Berg told Dr. Edd that he preferred having oral sex with boys entering puberty.  (*Id.* at

26).  Berg told Dr. Edd that he coped with his problems by abusing children.  Dr. Edd testified that

his notes from May 14, 2003, stated that Berg lamented that such a "good thing"—sex with children—was no longer available to him. (*Id.* at 28). Dr. Edd testified that during Berg's therapy, he appeared to be "grooming" a female patient who was also a victim of sexual assault. (*Id.* at 34).

Dr. Ilene Starbranch testified that Berg was admitted into Intracare Hospital because he had suicidal ideations. (Reporter's Record, Vol. V, p. 42). She testified that Berg suffered from a mood disorder similar to manic depression or bipolar disorder. She prescribed Depakote, a mood stabilizer. (*Id.* at 43). Dr. Starbranch agreed that if Berg continued to be compliant and took his medication, it would decrease the likelihood that he would act impulsively. On cross-examination, however, Dr. Starbranch testified that she could not say that Berg would not sexually abuse another boy. (*Id.* at 44).

Two of Berg's neighbors testified on his behalf. One, Jeff Railey, testified that Berg was a good neighbor and never attempted any inappropriate contact. (Reporter's Record, Vol. V, pp. 37-38). Margie Railey testified that she had been Berg's neighbor for twenty years. (*Id.* at 46). She allowed her sons to spend time with Berg. She knew about Berg's guilty plea, and she still believed that Berg was a good, considerate person. (*Id.* at 49).

Dale Huxwell testified that he had known Berg for two or three years. (Reporter's Record, Vol. V, p. 52). He testified that Berg called him and said he was about to commit suicide. Huxwell went to Berg's home, where he found Berg seated in a chair with a loaded gun. (*Id.* at 55). Huxwell testified that this occurred in May or June 2003. Huxwell testified that he was willing to help Berg in his recovery.

Tom Walters, Berg's employer for 22 years, testified that Berg was a good employee and a loyal friend. (Reporter's Record, Vol. V, p. 61). The fact that Berg had pleaded guilty to sexually

assaulting children did not affect his opinion of Berg.  (*Id.* at 62).  A coworker, Sandra Borack, testified that Berg was her supervisor and that he was a good person.  (*Id.* at 67).

Berg testified on his own behalf.  He testified that he was president of the security company where he had worked for 25 years.  (Reporter's Record, Vol. V, p. 69).  He lost his job when his security license was suspended as a result of the criminal charges against him.  (*Id.* at 69).  Berg testified he committed crimes against children, the most recent being G.L. and D.F.  (*Id.* at 70).  He testified that he had molested his adopted nephew when Berg was 18 years old and his nephew was young.  (*Id.* at 72).  He testified that the abuse lasted for a couple of years.  (*Id.*).  He testified that he also molested his nephew's friend when Berg was in his late teens and early twenties and the boy was 15 or 16 years old.  (*Id.* at 73).

Berg testified that he viewed James Wright like a son.  (Reporter's Record, Vol. V, p. 74).  Wright was 16 when he moved in with Berg.  (*Id.* at 75).  Berg testified that after James and Mary Wright started dating, Berg would see G.L. about twice a week.  (*Id.* at 75).  Berg testified that he and G.L. went bowling, to shopping malls, miniature golf courses, and shooting ranges.  (*Id.* at 77).  Berg's sexual interest in G.L. began when G.L. was 11.  (*Id.* at 78).  Berg testified that he never used force with G.L.  Berg testified that G.L. used to bring his friend D.F. to Berg's house and that Berg molested D.F. a couple of times.  (*Id.* at 81).  The sexual relationship with G.L. continued until he "acted out" with another child and Berg's conduct was revealed.  (*Id.* at 79).

Berg testified that he knew that his relationship with young boys was sick.  (Reporter's Record, Vol. V, p. 79).  Berg testified that he feared disclosure to law enforcement, and he was embarrassed and ashamed.  (*Id.* at 80).  Berg testified that after the abuse was revealed, he began attending therapy three times a week.  (*Id.* at 86).  He testified that he sees Dr. Starbranch every

couple of months to check his chemical imbalance, and Dr. Barbara Levinson, a sex offender counselor. (*Id.* at 87).  Berg testified that after therapy began, he had contact with a nine-year-old boy during a weekend camp-out and he let the nine-year-old sit on his lap. (*Id.* at 89-91).  He also allowed James Wright to bring his young daughter over to Berg's house. (*Id.* at 91).  Berg testified that he had never before been arrested or convicted of a felony. (*Id.* at 92).

On cross-examination, Berg admitted that he has had fantasies about young boys his whole life. (Reporter's Record, Vol. V, p. 100).  Berg admitted that he had touched G.L.'s penis several times, performed oral sex on G.L., put his penis into G.L.'s buttocks, and had G.L. perform oral sex on him. (*Id.* at 105-107).  Berg testified that all of these actions occurred at his house. (*Id.* at 107). Berg further testified that G.L. and D.F. would perform sexual acts on each other and Berg would watch. (*Id.* at 109).  He did not seek therapy because it would jeopardize his job. (*Id.* at 101).  Berg admitted telling G.L. that it was normal for a young boy to engage in sexual activities. (*Id.* at 106). He admitted saying that he was most pleasured when he was performing oral sex on a young boy entering puberty.  Berg admitted telling his therapist that he felt jealous when he found out G.L. was acting out with another boy and he was not there. (*Id.* at 108).

The jury sentenced Berg to two consecutive 35 year sentences.  After direct appeal and state habeas proceedings, this motion under § 2254 followed.

## IV.    The Claim of Ineffective Assistance of Trial Counsel

### A.      The *Strickland* Standard

The standard set out in *Strickland v. Washington,* 466 U.S. 668, 687 (1984), governs Berg's claim that his constitutional rights were violated due to the ineffective assistance of his trial counsel. U.S. CONST. amend. VI; *Wiggins v. Smith,* 539 U.S. 510, 521 (2003).  A petitioner must establish

both that: (1) counsel's performance fell below an objective standard of reasonableness in light of the prevailing professional norms; and (2) but for counsel's deficient performance, a reasonable probability exists that the result of the proceeding would have been different. *Virgil v. Dretke,* 446 F.3d 598, 608 (5th Cir. 2006) (citing *Strickland,* 466 U.S. at 687). A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Richards v. Quarterman,* 566 F.3d 553, 561 (5th Cir. 2009). *Strickland* is "clearly established Federal law, as determined by the Supreme Court of the United States." *Williams v. Taylor,* 529 U.S. 362, 391 (2000).

To show that counsel's performance was deficient, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687. Counsel's representation must fall below an objective standard of reasonableness as measured by prevailing professional standards. *See Little v. Johnson,* 162 F.3d 855, 860 (5th Cir. 1998). When reviewing counsel's performance, a court should make every effort to "eliminate the distorting effects of hindsight" and "evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689. Judicial scrutiny of counsel's performance is highly deferential. There is a "strong presumption that counsel performed adequately and exercised reasonable professional judgment." *Virgil,* 446 F.3d at 608 (internal citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins,* 539 U.S. at 521-22 (quoting *Strickland,* 466 U.S. at 690-91). But a court is "not required to condone unreasonable decisions parading under the umbrella of strategy, or to

fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson,* 194 F.3d 586, 604 (5th Cir. 1999).

Constitutionally sufficient performance requires counsel to pursue all reasonable leads. *Wiggins,* 539 U.S. at 524. In evaluating counsel, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Id.* at 527. However, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard,* 545 U.S. 374, 383 (2005). "Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." *Id.* at 389. With respect to expert testimony, "[c]ounsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment . . . and rule that his performance was substandard for doing so." *Smith v. Cockrell,* 311 F.3d 661, 676-77 (5th Cir. 2002), *overruled in part on other grounds, Tennard v. Dretke,* 542 U.S. 274 (2004); *Wilson v. Sirmons,* 536 F.3d 1064, 1089 (10th Cir. 2008) (noting that, to a degree, counsel should be able to rely on an expert to determine what evidence is necessary to an effective evaluation, and what additional evidence the expert needs to complete testing).

The Fifth Circuit has explained that due to "the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices." *Yohey v. Collins,* 985 F.2d 222, 228 (5th Cir. 1993). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of

counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (internal quotation marks and citations omitted); *accord United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) (citation omitted).

The prejudice prong of the *Strickland/Wiggins* standard asks "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams*, 529 U.S. at 393 n.17. "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* If the state court did not reach the prejudice prong, a federal court reviews that prong *de novo*. *Wiggins*, 539 U.S. at 534. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

The petitioner has the burden of showing prejudice. *Sonnier*, 476 F.3d at 358. Such a showing is made if "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

Conclusory allegations of ineffective assistance of counsel do not give rise to a constitutional claim for federal habeas relief. *Collier v. Cockrell*, 300 F.3d 577, 587 (5th Cir. 2002) (citations omitted); *see also Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("Because [petitioner] failed to set forth the nature of *any* of the errors trial counsel purportedly failed to preserve and did not set forth any resulting prejudice, the district court properly determined that these three claims of ineffective assistance were conclusory.") (emphasis in original). A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the

evidence. *Montoya v. Johnson,* 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied,* 522 U.S. 1067 (2001).  However, a reviewing court need not consider both prongs if the court concludes that petitioner has failed to prove either. *Strickland,* 466 U.S. at 697; *Amos v. Scott,* 61 F.3d 333, 348 (5th Cir. 1995) (citation omitted).

Berg pleaded guilty.  He does not challenge the plea.  He is challenging only the sentence. He must establish a reasonable probability that, but for the errors of trial counsel, the sentence would have been "*significantly* less harsh." *Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005) (citing *Spriggs v. Collins,* 993 F.2d 85, 88 (5th Cir. 1993)).[2]  In deciding whether a sentence would have been significantly less harsh but for defense counsel's error, the Fifth Circuit considers a number of factors, including:

> the actual amount of the sentence imposed on the defendant by the sentencing judge or jury; the minimum and maximum sentences possible under the relevant statute or sentencing guidelines, the relative placement of the sentence actually imposed within that range, and the various relevant mitigating and aggravating factors that were properly considered by the sentencer.

*Spriggs*, 993 F.2d at 88-89.

The issue is whether the state courts reasonably concluded that Berg's complaints about his trial counsel's performance failed to satisfy either prong of *Strickland.  Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied,* 540 U.S. 1154 (2004).  If the state courts failed to address either prong of the *Strickland* test, this court's review of the unadjudicated prong is *de novo.*

---

[2] In *United States v. Grammas,* the Fifth Circuit held that the Supreme Court's decision in *Glover v. United States* abrogated the significantly less harsh standard. *United States v. Grammas,* 376 F.3d 433, 438 (5th Cir. 2004) (citing *Glover v. United States,* 531 U.S. 198 (2001)). The Fifth Circuit later clarified, however, that *Glover*'s impact was limited to cases involving the federal sentencing guidelines. *Grammas,* 376 F.3d at 438 n.4. Because Berg was sentenced in state court, the significantly less harsh standard applies to his ineffective assistance claim.

*See Porter v. McCollum,* --- U.S. at ---, 130 S. Ct. at 452; *Rompilla v. Beard,* 545 U.S. 374, 390

(2005) (holding that *de novo* review of the prejudice prong of *Strickland* was required where the state

courts rested their rejection of an ineffective assistance claim on the deficient-performance prong

and never addressed prejudice); *Wiggins v. Smith,* 539 U.S. at 534 (same).  Under the AEDPA, to

obtain federal habeas relief on an ineffective assistance claim rejected on the merits by a state court,

the petitioner must do more than convince the federal court that the state court applied *Strickland*

incorrectly.  The petitioner must show the state court applied *Strickland* to the facts of his case in an

objectively unreasonable manner.  *Bell v. Cone,* 535 U.S. at 699.

## B.     The State Court Rulings

The state habeas court concluded:

> Applicant has not met his burden of proving by a preponderance of the evidence that he was denied the effective assistance of counsel. The Court reaches this conclusion after having listened to all of the witnesses, during both the trial and the postconviction writ hearing. The Court believes applicant was afforded constitutionally effective representation and that Becker's strategic decisions, even if not reasonable, did not prejudice applicant.

> But for counsel's failure to question veniremembers Kahan and Holt at the bench, the result of the proceeding would not have been any different. Similarly, counsel's decision to call Dr. Edd and applicant as witnesses and to choose the words he did during argument did not prejudice applicant.  Applicant has failed to show that, by a preponderance of the evidence, there is a reasonable probability that the proceeding's result would have been different but for counsel's conduct. The totality of Becker's representation was constitutionally sufficient.  Applicant was afforded a fair a [sic] trial.  Accordingly, the Court recommends relief be denied.

*Ex parte Berg,* Application No. 70,560-01 at 141; *Ex parte Berg,* Application No. 70,560-02 at 140.

Under the AEDPA, this court must give proper deference to the state court's determination that trial counsel rendered effective assistance. *See Ladd v. Cockrell*, 311 F.3d 349, 351 (5th Cir. 2002). Because the state court properly identified *Strickland* as the governing legal standard, the "unreasonable application" prong of section 2254(d)(1) applies. *Bell v. Cone*, 535 U.S. 685, 694-695 (2002). This court must determine whether the state court's application of *Strickland* was objectively unreasonable. *Id.*; *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc), *cert. denied*, 537 U.S. 1104 (2003). Under section 2254(d)(1), "[w]e have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of *Strickland* is erroneous or incorrect." *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (quoting *Neal*, 286 F.3d at 236). "The federal-habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state court decision is objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002).

Berg asserts that Becker, his trial counsel, rendered ineffective assistance in four respects. Each is examined below.

## C.      Analysis

### 1.      The Claim of Improper Questions During Voir Dire

The Sixth Amendment guarantees an impartial jury, and the presence of a biased juror may require a new trial as a remedy. U.S. CONST. amend. VI; *see Solis v. Cockrell*, 342 F.3d 392, 400 & n.44 (5th Cir. 2003). A juror is biased if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).

"Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia,* 500 U.S. 415, 431 (1991). The purpose of voir dire is to discern bias or prejudice in prospective jurors." *See Sandidge v. Salen Offshore Drilling Co.,* 764 F.2d 252, 258 (5th Cir. 1985). The constitutional guarantee of the right to an impartial jury includes adequate voir dire to identify unqualified jurors and intelligently exercise peremptory challenges. *Franklin v. State,* 138 S.W.3d 351, 354 (Tex. Crim. App. 2004).

"We grant broad discretion to the trial judge in making determinations of impartiality and will not interfere with such decisions absent a clear abuse of discretion." *United States v. Hinojosa,* 958 F.2d 624, 631 (5th Cir. 1992). The mere fact that an excluded question would have been helpful is insufficient to make its exclusion unconstitutional. To meet this burden, the question's exclusion must "render the defendant's trial fundamentally unfair." *Mu'Min,* 500 U.S. at 416 (citing *Murphy v. Florida,* 421 U.S. 794, 799 (1975)).

a.   **The Claim that Counsel Elicited Prejudicial Information from a Panel Member**

Berg complains that Becker elicited prejudicial information from a panel member during voir dire. The panel member, Andy Kahan, was a crime victim advocate for the City of Houston. Berg argues that Becker knew that Kahan was politically conservative and frequently appeared on television and in the newspaper making pro-victim and anti-defendant comments. Becker elicited from Kahan, in the presence of the panel, that he had worked with both victims and sex offenders. Becker asked Kahan, "And is it your opinion that sex offenders can never be successfully treated?" Kahan responded, "Yes." Berg argues that by asking these questions, the panel learned that the

crime victim advocate for the City who had worked with sex offenders and had the professional

opinion that such offenders can never be successfully treated.  Berg argues that these answers were

contrary to the defense theory that Berg could be treated successfully in sex-offender counseling.

Had Becker wanted to identify whether he had a basis for a challenge, he could have asked the panel

to raise their hands if they believed that a sex offender could not be treated successfully.

Alternatively, he could have elicited Kahan's opinion but not his background and then asked whether

anyone else on the panel agreed with him.

In his affidavit prepared at the request of habeas counsel, Becker explained his approach:

> Andy Kahan, the Crime Victims' Advocate for the City of Houston,
> was a member of the jury panel.  I knew that he is very conservative
> and that he frequently appeared on television and was quoted in the
> newspaper making pro-victim and anti-accused comments on crime
> in general and specific cases.   I elicited that he had a lot of
> experience, had been quoted in the newspaper that morning, and had
> worked with both victims and sex offenders.  I then asked, "And it is
> your opinion that sex offenders could never be successfully treated?"
> He responded, "Yes."  I asked this question in an effort to invoke a
> response that would enable me to successfully challenge him for
> cause.  Despite his answer, I did not challenge him for cause; instead,
> I exercised a peremptory challenge on him.  In retrospect, I should
> have asked this question at the bench, outside the hearing of the rest
> of the panel, in view of the fact that the defense strategy was to show
> that Mr. Berg was receiving sex offender counseling in an effort to
> treat and control his sex addiction.

*Ex parte Berg,* Application No. 70,560-01 at 34-35; *Ex parte Berg,* Application No. 70,560-02 at

34-35.

In his affidavit prepared at the request of the prosecutor, Becker testified as follows:

> During voir dire, I questioned the venire panel, which included Andy
> Kahan (Juror No. 43), the City of Houston's crime victim's advocate,
> and a woman named Brooke Holt (Juror No. 11).  In my affidavit to
> Mr. Schaffer, I stated that, in retrospect, I should have questioned

these two people at the bench outside the hearing of the remaining venirepersons. Concerning Mr. Kahan, I was well aware prior to trial of Mr. Kahan's position as the city's crime victim's advocate and of his prior active participation with crime victims advocate groups. During my questioning of Mr. Kahan, I asked Mr. Kahan about his opinion whether sex offenders could not be successfully treated, and Mr. Kahan answered in the affirmative. My questioning was not intended to expose Mr. Kahan's feelings on this issue since I had a good idea that Mr. Kahan, based upon his present job and prior involvement with crime victims advocacy groups, believed that sex offenders could not be treated and should be locked away in prison forever. Instead, my questioning of Mr. Kahan was intended to expose other venirepersons who privately held the opinion that sex offenders could not be treated but were unwilling to express those feelings. Before my questioning of Mr. Kahan, I questioned other venirepersons about their opinions of whether sex offenders could never be treated. Very few venirepersons responded to this question. I figured that Mr. Kahan's expression of his feelings in public would likely cause other venirepersons to feel more comfortable with voicing a similar private opinion which allowed me to strike them from the jury. After Mr. Kahan's responses, more venirepersons expressed the same opinions as Mr. Kahan. Upon reviewing the voir dire portion of the appellate record prior to, during, and after my questioning of Mr. Kahan, I now no longer believe that I should have asked these questions at the bench since I wanted other venirepersons to be comfortable with answering this question truthfully so that I could strike them.

Additionally, the affidavit that I provided to Mr. Schaffer was incorrect in stating that I exercised a peremptory strike on Mr. Kahan. Upon review of the clerk's record, I see that Mr. Kahan was not in the group of jurors on which I could exercise a peremptory challenge after the trial court granted the challenges for cause.

*Ex parte Berg*, Application No. 70,560-01 at 95-96; *Ex parte Berg,* Application No. 70,560-02 at 91-92.

The state habeas court conducted a hearing to consider the inconsistencies between the affidavits. Randy Schaffer, Berg's habeas counsel, questioned Becker about why he had filed the second affidavit. Schaffer played a tape recording of a telephone conversation he had with Becker,

in which Becker said he would prepare a third affidavit to undo the "damage" he had done in his second affidavit.   Schaffer asked Becker if the prosecutor had suggested certain strategies and whether Becker had embraced those strategies in his second affidavit.

On cross-examination, the prosecutor, Baldwin Chin, asked Becker if Schaffer had chosen specific parts of the record for Becker to look at to refresh his  memory about the proceeding.  (*Id.* at 54).  Becker testified that he liked Berg and wanted to help him get a new punishment hearing. Becker testified that he did his best to be truthful, regardless of whether he was helping Schaffer or Chin.  (*Id.* at 56).  Becker testified that Berg chose to plead guilty and seek probation.  He elected to have the jury decide the sentence after Becker explained that the judge could not give probation on the case.

On direct examination, Schaffer asked Becker if his questioning of Andy Kahan was counter to the defense's strategy of showing that sex offenders could be treated.  Becker testified on both direct and cross that he knew Andy Kahan would express his opinion that treating sex offenders was futile.   Becker hoped that having one person state an unfavorable opinion would make other members of the venire more comfortable in expressing similar sentiments.   *Ex parte Berg,* Application No. 70,560-01 (Event ID  2342830 at 35, 61).  Becker denied that his affidavits on this issue were conflicting.  Becker emphasized that he needed to know if the venire panel believed that sex offenders could be rehabilitated because those who thought sex offenders could not be rehabilitated were not likely to give probation.  When he first asked the panel if sex offenders could be rehabilitated, only two members responded.  (*Id.* at 65).  Becker testified that based on his experience and his training in trial law, many jurors do not like to answer questions that make them appear biased.  Becker wanted the venire to express their feelings about whether sex offenders could

be rehabilitated. (*Id.* at 68). Becker wanted to expose other venire members who shared Kahan's opinion that sex offenders could not be rehabilitated. After Kahan expressed his opinion, eight other members of the venire expressed similar opinions. (*Id.* at 71).

The state habeas court found:

> 1.   Becker's questioning of Andy Kahan.
>
> Becker questioned the venire panel about whether sex offenders could be successfully treated, then asked venireperson Andy Kahan, the crime victims' advocate for the City of Houston, whether sex offenders could never be successfully treated. Kahan responded affirmatively. Becker knew that Kahan was the crime victims' advocate for the City of Houston and had previously participated in crime victims' advocacy groups. Becker wanted Kahan to publicly express these opinions in order to allow the other venirepersons who privately held similar opinions to feel more comfortable in expressing such opinions so that Becker could remove them from the jury. Becker then asked the entire venire the same question and received responses similar to Kahan's. Because he was not in the available group of jurors after the Court granted challenges for cause, Becker did not exercise a peremptory strike on Kahan, and Kahan did not serve on the jury. Becker contends his decision to question Kahan within the hearing of the venire panel was strategic. Even if the Court were to conclude that applicant rebutted the presumption that Becker's strategic decision was sound trial strategy, the Court finds applicant has not demonstrated that Becker's performance prejudiced his defense. No venire member voicing concerns similar to Kahan served on the jury, and applicant was not forced to accept any otherwise objectionable jurors. The Court concludes, therefore, applicant has not satisfied *Strickland*'s second prong. Because applicant failed to demonstrate prejudice to his defense, his claim fails.

*Ex parte Berg,* Application No. 70,560-01 at 138; *Ex parte Berg,* Application No. 70,560-02 at 137.

Berg alleges that Becker was deficient because the questions he asked Kahan were inconsistent with the defense strategy of showing that Berg had admitted to sexually assaulting two young boys but was remorseful and had acknowledged his illness and was obtaining help. The

strategy included showing that Berg had made progress during his brief period of counseling and would continue with sex offender therapy. Becker intended to, and did, argue that the jury should sentence Berg to probation because the therapy would be effective and he would not be a threat. Becker knew that Kahan was an advocate for victim's rights and elicited the opinion that sex offenders could not be rehabilitated to expose other members of the venire with similar feelings. Once Becker learned which members of the venire believed that sex offenders could not be rehabilitated, he moved to strike them, improving Berg's chances of receiving probation.

The following members of the venire stated that they could never give probation to a sex offender: venirepersons 4, 6, 17, 22, 27, 39, 48, 51, 54, 56, 57, 58, 62, and 65. (Reporter's Record, Vol. III, pp. 60-65). Those members of the venire who said that sex offenders could not be rehabilitated did not serve on Berg's jury. (Reporter's Record, Vol. III, p. 77).

Berg has not satisfied the prejudice prong of *Strickland* because he has not shown that anyone who was prejudiced against him served on the jury. At trial, the prosecution presented the testimony of Dr. Thompson, who testified that sex offenders can never be cured. Berg presented the testimony of Dr. Edd, who expressed a similar view. The answer to the question in voir dire could not have affected the outcome, given the expert testimony. And the question and answer ensured that the jury did not include individuals predisposed to such a view. Berg fails to establish actual prejudice or to show that the state court's decision to reject his claim was objectively unreasonable under *Strickland.* Berg is not entitled to habeas relief on this claim.

### b. The Claim that Counsel Elicited Prejudicial Information from Another Panel Member

Berg complains that Becker elicited unfavorable information from Brooke Holt, another panel member.  The following exchange took place during voir dire:

| | |
|---|---|
| MR. BECKER: | The DA was asking if anybody knows anybody who has sex abuse offenses against them.  If you look on my cell phone, I have the guy who puts in the glass on the car on speed dial.  They break into my car often.  They never take anything.  They break in, look around, go home.  If you put me on the jury and we had a defendant accused of burglary of a motor vehicle, I could not serve on that jury.  I could not be on that jury because I would want to take them outside, string them up.  What I'm trying to decide, based on something that happened to you, a family member, a relative, neighbor, close friend, if you can think of any reason because of the nature of the case why you would not be fair and impartial in hearing the evidence concerning the case of Mr. Berg, besides anything you've already expressed?  I don't want you to talk about things you've said before. |

. . .

| | |
|---|---|
| MR. BECKER: | Ms. Holt? |
| VENIREPERSON: | Yeah. |
| MR. BECKER: | Okay.  Who would agree with—do you think you would be biased? |
| VENIREPERSON: | I would have trouble.  I would have trouble, but I would try to consider everything. |
| THE COURT: | Nobody is telling you what you've got to do one way or the other.  You do whatever you think is appropriate based on the law and |

| | |
|---|---|
| | evidence.  All that anybody is asking is you keep an open mind going in.  After you get the law from the Court, you make your decision based on that. |
| MR. BECKER: | You said you would try to consider everything? |
| VENIREPERSON: | My husband's brother was sexually assaulted, and I've just seen the issues that the family has dealt with. |
| MR. BECKER: | Did it tear the family apart? |
| VENIREPERSON: | Well, his brother committed suicide.  I wasn't around, but— |
| MR. BECKER: | It had an effect on other people? |
| VENIREPERSON: | Yeah. |
| MR. BECKER: | Would that place Mr. Berg at a disadvantage?  You went back to the jury room, started to look at all the evidence, is he going to start out at the bottom line? |
| VENIREPERSON: | I might have trouble considering probation. |
| MR. BECKER: | It''s not a question of whether you would have trouble with it.  Is there any set of circumstances, based on your experiences— and those come into play.  The example I gave of a car thief.  I would say I would consider probation, but if they had a sad story— |
| VENIREPERSON: | He might start out behind. |
| MR. BECKER: | But you could consider probation? |
| VENIREPERSON: | I would try to consider it. |

(Reporter's Record, Vol. III, pp. 68-71).

Berg argues that Holt's response informed the jurors that Berg could never be cured and G.L. would have lasting emotional scars.  Berg alleges that Becker could have asked Holt at the bench about the manner in which the sexual assault on her husband's brother affected his family.

In his affidavit prepared at the request of habeas counsel, Becker testified as follows:

> A venirewoman told me that her husband's family had to deal with his brother being sexually assaulted.  I asked, "Did it tear the family apart?"  She responded, "Well, his brother committed suicide."  I asked this question in an effort to determine whether she could consider probation.  In retrospect, I should have asked the question at the bench, outside the hearing of the rest of the panel, in view of the likelihood that it would elicit a prejudicial response.

*Ex parte Berg,* Application No. 70,560-01 at 35; *Ex parte Berg,* Application No. 70,560-02 at 35.

In his affidavit prepared at the request of the prosecutor, Becker testified:

> Concerning Brooke Holt, I was questioning the venire panel about any event, sexually-related or otherwise, which occurred in their lives or the lives of their friends or family that could cause them not to be fair and impartial to Mr. Berg.  I believed that this questioning was necessary to expose any preconceived opinions that would allow me to make challenges for cause or to exercise peremptory challenges.  During this series of questioning, Ms. Holt stated that she would have trouble not being biased but would try to consider everything.  Ms. Holt later stated that her husband's brother had been sexually assaulted and that he committed suicide.  My questioning of Ms. Holt elicited information that she was [sic] appeared to have a bias against defendants like Mr. Berg.  While it may have been a better practice to question Ms. Holt at the bench, in reality, I am not allowed to question every venireperson at the bench.  I really did not expect that Ms. Holt would blurt out that her husband's brother had been sexually assaulted and then later committed suicide.  Subsequently, I requested that Ms. Holt be brought before the bench for questioning about whether she could consider the full range of punishment.  Regardless, I did not feel during my portion of voir dire the need to question her at the bench outside the hearing of the other venirepersons.

*Ex parte Berg,* Application No. 70,560-01 at 96; *Ex parte Berg,* Application No. 70,560-02 at 92.

At the postconviction hearing, Schaffer asked Becker if he realized during this part of the voir dire that further inquiry of this panel member would be prejudicial to Berg. Becker said he did not. *Ex parte Berg,* Application No. 70,560-01 (Event ID 2342830) at 36. Becker agreed that the answer about the suicide was highly prejudicial. Although he should have asked her about it at the bench, he could not question each venireperson at the bench. (*Id.* at 41). Becker said he had no way to know that she would give this response to the question. On cross-examination, Becker explained that when Holt simply said that she would have trouble, but would try to consider everything, he did not expect her to say that a family member had been sexually assaulted. Becker did not expect that she would say that her brother-in-law committed suicide. Becker explained that he tried to elicit information about Holt's concern over her ability to be unbiased so that other members of the panel would feel comfortable disclosing similar information. (*Id.* at 75). At that point, Becker did not think it was necessary to question her at the bench. (*Id.* at 76). Becker testified that it would make the judge angry if he tried to question everyone at the bench. He did not know until voir dire was completed that he would only need to question a few members of the venire panel. (*Id.* at 78).

The state habeas court found as follows:

> 2.    Becker's questioning of Brooke Holt.
>
> Becker questioned the venire panel about any experience with or knowledge of any event which would affect the venirepersons' fairness or impartiality.   Becker then specifically questioned venireperson Brooke Holt about whether she would be biased, and Holt responded by saying that she "would have trouble" but "would try to consider everything". Holt went on to state that her "husband's brother was sexually assaulted" and that she saw "the issues that the family has dealt with". Becker asked Holt if this event tore the family apart, and Holt responded that her husband's brother "committed

suicide" but that she was "not around". Holt also expressed concerns about her ability to consider probation. Becker questioned the venire panel in this manner because he believed that this questioning was necessary to expose any venirepersons harboring preconceived opinions so that he could remove them from the jury. Becker had no way of knowing that Holt would make the statements she did. With hindsight, Becker believed he should not have asked Holt about whether the sexual abuse incident tore the family apart in the entire venire's presence. Becker, however, did not believe that bringing every venireperson to the bench for discussions about whether there was anything that could cause a venireperson to not be fair or impartial was feasible or even a good strategy. Becker did not feel that it was necessary at the time of voir dire to question Holt at the bench outside the hearing of the venire panel. Even if the Court were to conclude that applicant rebutted the presumption that Becker's strategic decision not to question Holt outside the venire's presence was sound trial strategy, the Court finds applicant has not demonstrated that Becker's performance prejudiced his defense. Applicant fails to demonstrate that Holt's revelations had a negative impact on the venire, and applicant was not forced to accept any otherwise objectionable jurors. The Court concludes, therefore, applicant has not satisfied *Strickland*'s second prong. Because applicant failed to demonstrate prejudice to his defense, his claim fails.

*Ex parte Berg,* Application No. 70,560-01 at 138-139; *Ex parte Berg,* Application No. 70,560-02 at 137-138.

The record supports the state court's finding. Becker's conscious and informed tactical decision cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill-chosen that it permeates the entire trial with obvious unfairness. *United States v. Cavitt,* 550 F.3d 430, 435, 440 (5th Cir. 2008) (quoting *Crane v. Johnson,* 178 F.3d 309, 314 (5th Cir. 1999)) (alteration in original). Becker sought to identify those members of the venire who had been affected by sexual assault, to learn whether that experience would prevent them from viewing the evidence with an open mind. When venireperson Holt said that she was concerned that she might have

"trouble," Becker did not know that she would reveal that a member of her husband's family had been sexually assaulted and ultimately committed suicide. In hindsight, Becker believes that he should have questioned the venireperson at the bench, but hindsight is not the proper measure. Becker was trying to encourage the panel to be forthcoming about a very sensitive matter so he could gauge possible bias.

Berg complains that Holt's response told the panel that G.L. would have long-term psychological problems. This response by an individual who did not serve on the jury was dwarfed by the evidence the jury heard. The jury heard G.L. and D. F. testify, as well as G.L.'s mother and D.F.'s father. The jury knew that both victims were alive and the jury could gauge their conditions. Berg fails to establish actual prejudice. He has not shown that the state court's decision to reject his claim was objectively unreasonable under *Strickland*. Berg is not entitled to habeas relief on this claim.

### 2.    The Claim Based on Counsel's Decision to Call Certain Witnesses

Berg complains about Becker's decision to call Dr. Nicholas Edd to testify. On cross-examination, the prosecutor elicited from Dr. Edd what Berg had told him. The information included that since age 18, Berg had molested 5 boys, including G.L. and D.F.; that he partially blamed G.L., he thought that their sexual relationship was acceptable under the circumstances and considered himself to be a victim; he fantasized about young boys; and he is "most pleasured when he is performing oral sex on a young boy about puberty [who is] experiencing it for the first time," and he "laments that such a good thing is no longer available." Dr. Edd expressed concern that Berg resisted confronting his addictive behaviors and abused alcohol.

Berg testified in his own behalf.  Berg testified on direct examination that when he was 18, he had molested his nephew for about two years; he molested his nephew's friend during the same period; G.L. enticed him into a sexual relationship by entering his bedroom in pajamas; he molested D.F. a couple of times; he is attracted to young boys as a result of incidents that occurred when he was a child; and he is sick, needs help, and is in sex offender counseling.  The prosecutor elicited from Berg on cross-examination that G.L. occasionally initiated or encouraged the sexual contact, such as by performing oral sex; it made Berg happy to perform oral sex on and masturbate G.L.; "by the letter of the law" he had tried to put his penis in G.L.'s anus; he is aroused watching young boys have sex with each other; and he may have told his therapist that he was jealous to learn that G.L. acted out with another boy when he was not present.

Berg argues that although Becker's decision to call Dr. Edd and Berg to testify was strategic, that strategy was unsound in view of the damaging information contained in Dr. Edd's records. Assuming that Becker could not have elicited that Berg was receiving sex offender counseling without calling Dr. Edd and Berg to testify, Berg insists that mitigating aspects of the fact he was in counseling were significantly outweighed by the damaging information the prosecutor elicited. Berg insists that the only sound trial strategy would have been not to present any testimony about his sex offender counseling.

In his affidavit prepared at the request of habeas counsel, Becker testified as follows:

> Nicholas Edd, a psychologist, had been providing sex offender counseling to Mr. Berg since March of 2003. I read Dr. Edd's records before trial and knew that they contained prejudicial information. For example, Mr. Berg told Dr. Edd that, at age 18, he engaged in fondling, oral sex, and anal sex with his 12-year-old nephew; that he engaged in inappropriate sexual behavior with two other boys in addition to the two complainants; that he thought that his sexual

conduct with the complainants was acceptable under the circumstances and that he was a victim; that he twice violated his contract not to have contact with children; that he resisted confronting his addictive behaviors; that he abused alcohol; that he fantasized about young boys; that he groomed a female sexual assault victim that he met in group therapy; and that he was "most pleasured when he's performing oral sex on a young boy about puberty [who is] experiencing it for the first time," and "laments that such a good thing is not available." Nonetheless, I decided to call Dr. Edd and Mr. Berg to testify at the punishment stage because I thought that the jury would not consider probation unless it knew that Mr. Berg was receiving sex offender counseling; I also thought that the jury would like Mr. Berg.

*Ex parte Berg,* Application No. 70,560-01 at 35-36; *Ex parte Berg,* Application No. 70,560-02 at 35-36.

In his affidavit prepared at the request of the prosecutor, Becker testified as follows:

In the defense case-in-chief, I presented the testimony of Dr. Nicholas Edd, a psychologist specializing in sex offender treatment who had been treating Mr. Berg for approximately ten months prior to trial. Since I reviewed Dr. Edd's records prior to trial, I was fully aware that Dr. Edd could testify about some fairly unfavorable information received during Mr. Berg's treatment sessions. However, I believed that, despite the unfavorable information, it was necessary to present Dr. Edd's testimony to show that Mr. Berg was receiving and benefiting from sex offender counseling and treatment. Additionally, I also presented Dr. Edd's testimony in order to establish an independent source of evidence about Mr. Berg's considerable amount of remorse for his crimes and of Mr. Berg's progress made as a result of sex offender treatments. I believed that Dr. Edd's testimony was necessary to show that Mr. Berg could be rehabilitated before the jury would even consider granting probation to Mr. Berg. Additionally, Mr. Berg testified during the defense case-in-chief. Prior to trial, I discussed with Mr. Berg the advantages and the risks of testifying. During these discussions, I believe that I conveyed to Mr. Berg my opinion that it would be wise for him to testify at trial in order to show his remorsefulness and the progress made as a result of sex offender treatment. Mr. Berg did not have any prior convictions that the State could use to impeach him. I believed that Mr. Berg was a nice and very likeable man and hoped that the jury

would like him as much as I and everyone else did. Based upon these discussions, Mr. Berg personally decided to testify. Again, I thought that it was important for the jury to see Mr. Berg's remorsefulness and progress before the jury would ever consider granting Mr. Berg probation. In my discussions with Mr. Berg, I informed him that the State was aware of his many uncharged sexual assaults because the prosecutor obtained the psychiatric records from Dr. Levinson, Dr. Starbranch, and Dr. Edd and could likely admit these records in trial since these records included a business records affidavit. Regardless of whether Dr. Edd and Mr. Berg testified, the State could still have presented evidence to the jury concerning Mr. Berg's admissions to committing many other sexual assaults.

*Ex parte Berg*, Application No. 70,560-01 at 96-97; *Ex parte Berg*, Application No. 70,560-02 at 92-93.

At the hearing on August 9, 2007, Schaffer asked Becker why he did not introduce the unfavorable information from Berg's medical records during his cross-examination of Dr. Edd. Becker explained that the prosecutor could have introduced the medical records at any time. *Ex parte Berg*, Application No. 70,560-01 (Event ID 2342830) at 36. Becker explained that it was his trial strategy to let the prosecutor introduce the medical records because there was no good way to present that damaging information. (*Id.* at 46). Becker testified that he had spoken to the prosecutor and knew that she planned to introduce the records.

Becker testified that he thought it was essential for him to present the testimony of Dr. Edd and Berg because the fact that Berg was in sex-offender therapy was the basis for asking for a lenient sentence, including probation. (*Id.* at 47-48). Becker testified that he knew from day one that the jury would hate Berg's guts after they heard all the things he had told Dr. Edd. (*Id.* at 49). Becker thought the jury would like Berg better if they heard from him personally. (*Id.* at 49).

On cross-examination, Becker testified that he reviewed the medical records of Dr. Levinson, Dr. Starbranch, and Dr. Edd. Becker knew that these records contained prejudicial information about extraneous sexual offenses. (*Id.* at 80). Becker told Berg that the information in these records, that he had disclosed during these sessions, could be used against him. At trial, Dr. Edd gave favorable information about Berg. Becker elicited from Dr. Edd testimony that Berg had made significant progress from sex offender counseling; had benefitted greatly from such counseling; was motivated to change his prior behavior; had accepted the responsibility for his actions; had self-reported some violations from his contract that he had with Dr. Edd; had engaged in a high level of participation with Dr. Edd; displayed empathy for his prior sexual assault victims; and had indicated significant remorse for his actions.

Becker testified that the prosecutor could have introduced the damaging records without a sponsoring witness, even if Dr. Edd did not testify. Becker explained why he did not elicit the damaging information on direct examination. Becker did not know which issues the prosecutor would choose to present, and he did not want to make it easy for her. (*Id.* at 85).

Becker testified that it was necessary to call Dr. Edd because a jury would not consider a light sentence for a man who had pleaded guilty to this heinous offense, unless they thought he could change. Becker testified that nobody would believe a person could change such behavior on his own. Becker thought it was essential to have a trained professional, like Dr. Edd, testify. Dr. Edd's testimony, despite its drawbacks, fit with Becker's strategic decisions and theories about how to present Berg in the hope of probation. Becker testified that the State could have called Dr. Edd even if Becker had not. Becker made a strategic choice to limit the number of attacks on the State's case to prevent the prosecutor from "unloading all of her evidence on Berg." (*Id.* at 87).

Becker explained that one reason he was comfortable with Berg testifying was his lack of prior convictions. He wanted the jury to hear that Berg was never violent. Becker testified that the best outcome would be for the jury not to hate Berg, in light of his crimes. Becker elicited from Berg that he had made significant progress during his counseling and that he was remorseful. Becker thought it was necessary for the jury to hear Berg's sincere acceptance of responsibility. (*Id.* at 91).

The state habeas court found:

> C.   Becker's decision to call Dr. Nicholas Edd and applicant as witnesses was objectively reasonable and did not prejudice applicant. Applicant claims Becker's decision to call Dr. Nicholas Edd, applicant''s treating psychologist, and applicant as witnesses was constitutionally deficient. The Court disagrees. Applicant called Dr. Nicholas Edd as a fact and an expert witness. Dr. Edd is a psychologist and a registered sex offender treatment provider. He had been counseling applicant since March of 2003, before the State accused applicant of sexually assaulting a child. Dr. Edd testified that applicant was actively engaged in treatment; expressed remorse for his prior acts of child molestation; and made progress as a result of the counseling. Dr. Edd also testified that sex offenders cannot be cured and that applicant possessed addictive behaviors. During the State's cross-examination, Dr. Edd testified about applicant's uncharged sexual offenses as well as other unfavorable information disclosed by applicant during the counseling sessions. Dr. Edd's testimony was relevant because applicant was seeking community supervision from the jury for a serious offense. Dr. Edd's testimony helped the jury to determine applicant's appropriate sentence. *See Rogers v. State,* 991 S.W.2d 263, 265 (Tex. Grim. App. 1999) ("determining what is relevant . . . should be a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case"). Applicant also testified about his charged and uncharged sexual offenses and admitted that he is sick and needed help. Further, applicant accepted responsibility for his improper actions and indicated that he was in sex offender counseling. During the State's cross-examination, applicant testified about his actions and feelings while committing the charged and uncharged sexual offenses. Becker reviewed Dr. Edd's records prior to trial. He was aware that Dr. Edd could provide testimony that was fairly unfavorable to applicant in addition to supporting applicant's

plea for probation.  Becker believed that it was necessary to present testimony from Dr. Edd to show that applicant was receiving and benefiting from sex offender counseling and treatment; expressed remorse for his sex crimes; and made progress from the sex offender counseling and could be rehabilitated before the jury would consider granting probation.  Becker called applicant as a witness after discussing the advantages and risks involved in testifying.  Becker conveyed his professional opinion to applicant that it [sic] if he wanted the jury to assess his punishment at probation, it would be wise for him to testify.  Becker knew that applicant did not have any prior criminal convictions that the State could use to impeach applicant.  Becker believed that it was necessary for the jury to see applicant's remorsefulness and progress from sex offender counseling if the jury would ever consider granting probation.  The Court concludes applicant chose to testify during his trial after Becker made him aware of the possible risks and benefits associated with testifying.  Becker's decision to call Dr. Edd and applicant as witnesses comported with his overall strategy to portray applicant as remorseful and treatable and thereby deserving of probation and was objectively reasonable.

*Ex parte Berg,* Application No. 70,560-01 at 139-140; *Ex parte Berg,* Application No. 70,560-02 at 138-139.

Dr. Edd's testimony contained both helpful and damaging information.  Trial counsel's reasoned decision to introduce evidence containing both helpful and damaging information was not deficient performance. *Duff-Smith v. Collins,* 973 F.2d 1175, 1183 (5th Cir. 1992); *see also Johnson v. Cockrell,* 306 F.3d 249, 253 (5th Cir. 2002) (failure to introduce double-edged evidence, so long as part of an informed trial strategy, cannot constitute deficient performance); *Foster v. Johnson,* 293 F.3d 766, 778-79 (5th Cir.), *cert. denied,* 537 U.S. 1054 (2002).  Becker made reasoned strategic decisions to present Dr. Edd's testimony.  Becker knew that the prosecutor had very damaging evidence against Berg and that she could introduce the medical records from Berg's treating psychologists, including Dr. Edd, at any time, even if they did not testify.  By calling Dr. Edd, Becker

sought to show that Berg was remorseful and that he was benefitting from therapy. By showing that Berg had accepted responsibility for his offenses against children, Becker sought to show that Berg was capable of being rehabilitated and deserving of probation. Becker had legitimate, objectively reasonable, strategic reasons for presenting the potentially double-edged evidence from Berg's sex offender therapy sessions with Dr. Edd. *See Kitchens v. Johnson,* 190 F.3d 698, 701-03 (5th Cir. 1999) (trial counsels' decision not to offer evidence related to the defendant's forced consumption of alcohol during an abusive childhood did not constitute ineffective assistance because the evidence raised the issue of prior drug use by the defendant); *see Johnson v. Cockrell,* 306 F.3d 249, 253 (5th Cir. 2002) (noting that "so long as the decision not to introduce double-edged mitigation evidence was based on trial strategy rather than lack of investigation, those questions are even less susceptible to judicial second-guessing") (internal quotation marks and citations omitted).

None of Becker's decisions were so poor as to permeate the trial with unfairness. Berg has not overcome the presumption in favor of finding counsel's actions reasonable. *Id.* at 689. The decision to present the testimony of Dr. Edd was objectively reasonable. Berg has not demonstrated that there was a reasonable probability that the outcome would have been different had Becker not called Dr. Edd to testify.

This state trial court's decision not to grant habeas relief for the ineffective assistance of counsel claim was not objectively unreasonable. Habeas relief cannot be granted on this claim.

### 3.    The Claim of Improper Closing Argument

Berg complains that Becker asked the jury for probation by arguing that probation would be bad because Berg would have to tell people that he had committed "the worst crime of all." (Reporter's Record, Vol. 5, p. 118). Berg argues that this was tantamount to telling the jury that the

aggravated sexual assault of a child is worse than capital murder.  Berg asserts that competent

counsel would have made the argument without referring to the offense as "the worst crime of all."

In his affidavit prepared at the request of habeas counsel, Becker testified:

> I argued during summation that probation was appropriate in view of the boys' ages (12 and 13), as Mr. Berg did not use force or violence, was remorseful, and was receiving sex offender counseling. However, I also referred to the offense of aggravated sexual assault as "the worst crime of all."  In retrospect, that reference was a poor choice of words and did not help Mr. Berg.

*Ex parte Berg,* Application No. 70,560-01 at 36; *Ex parte Berg,* Application No. 70,560-02 at 36.

In his affidavit prepared at the request of the prosecutor, Becker testified:

> During my summation, I argued that Mr. Berg had committed the "worst crime of all" and that he did "horrible, horrible things."  My strategy was to paint Mr. Berg as a person with a problem that could be treated with the benefit of probation and therapy. I referred to Mr. Berg as being "sick" like an addict in an effort to evoke the jury's sympathy and mercy. In my affidavit that I provided to Mr. Schaffer, I indicated that, in retrospect, I may have used a "poor choice of words and did not help Mr. Berg."  However, I made this argument because I wanted the jury to see that Mr. Berg should receive probation because his friends, neighbors, and fellow employees testified during trial that, even though they were aware of the horrible crimes that Mr. Berg committed, they nonetheless considered him to be a friend and did not feel that he was a threat to anyone.  In my mind, telling someone that you are a child molester is much more difficult socially than telling someone that you are a murderer. In this case, I believe that Mr. Berg admitting that he sexually molested children to his friends, neighbors, and fellow employees was more difficult than if he admitted to killing someone.  Nonetheless, I believed that the willingness of Mr. Berg's friends, neighbors, and fellow employees to come to court, after learning of Mr. Berg's crimes, to testify on his behalf would be essential to getting probation.  As a result, this portion of my argument was a strategic decision.

*Ex parte Berg,* Application No. 70,560-01 at 97; *Ex parte Berg,* Application No. 70,560-02 at 97.

At the hearing on August 9, 2007, Schaffer asked if the prosecutor had suggested to Becker that his strategy was to show that Berg's friends still supported him even though he had committed such a heinous crime. Becker testified that this strategy was his idea, not the prosecutor's. *Ex parte Berg,* Application No. 70,560-01 (Event ID 2342830) at 51.

On cross-examination, Becker testified that the strategy was to paint Berg as a man with many problems who could be treated with probation and sex offender therapy. (*Id.* at 93). Becker referred to Berg as sick to invoke some level of sympathy and mercy from the jury. Becker presented the testimony of friends and coworkers who said they considered Berg a friend despite the allegations of sexual abuse. Becker testified that it was easier to admit that someone was a murderer than to admit that someone had committed sexual assault against a child. Though Berg admitted to this socially horrible crime, he nonetheless had friends, neighbors, and coworkers come into court to testify on his behalf. Becker thought this might influence the jury toward probation. (*Id.* at 97). Becker testified that he did everything with the purpose of serving his client.

The state habeas court found:

> D.     Trial Counsel was not ineffective for choosing the phrase: "worst crime of all" to describe applicant's child molestation during punishment argument.
>
> Applicant claims Becker's argument to the jury was constitutionally deficient. Again the Court disagrees. Becker argued to the jury that applicant was a person who was "sick" and did "horrible, horrible things" and there was no apology or excuse for the things he did. Becker stated that applicant did not have to testify but he "stepped up to the plate" and admitted to committing his illegal acts. He reminded the jury that applicant's sex offender treatment counselor spoke about applicant's progress and motivation to change and that applicant always had a job and friends and had never been

arrested, put on probation, or been in trouble. Becker told the jury that applicant informed possible defense witnesses that he essentially committed the "worst crime of all," but the defense witnesses nonetheless chose to come to court and testify that applicant was "worth saving". Becker's strategy was to convince the jury that applicant was "sick" like an addict in an effort to evoke the jury's sympathy and mercy. Becker tried to let the jury see that applicant should receive probation because his friends, neighbors, and co-workers were informed by applicant about his child molestation yet were willing to come to court and testify that applicant was a friend and not a threat. Becker believed that it is more difficult socially to admit to being a child molester than to admit to being a murderer. The jury could have assessed applicant's punishment from five years probation up to life in prison. Becker urged the jury not to lock up applicant because he was "sick" but that they should give applicant "one last chance" if he is truly remorseful, helps the victims and himself, continues to get help, and obeys the rules. Becker urged the jury to sentence applicant to probation. The Court finds that while the phrase, "worst crime of all" was perhaps inartful, Becker made the argument based upon his belief that child molestation was a socially unacceptable crime and in an effort to focus the jury on applicant's remorsefulness and capacity for rehabilitation. Becker did not argue that applicant had in fact committed a crime worse than capital murder, but suggested that applicant had admitted to committing the most socially unacceptable crime yet still had the support of his friends, neighbors, and co-workers. Becker's defensive strategy, overall, was reasonable, and Becker's argument did not have a prejudicial impact on applicant.

*Ex parte Berg,* Application No. 70,560-01 at 140-141; *Ex parte Berg,* Application No. 70,560-02 at 139-140.

Decisions on closing argument are matters of trial strategy. *United States v. Martinez,* 974 F.2d 589, 591 (5th Cir. 1992). In *Kitchens v. Johnson,* 190 F.3d 698 (5th Cir. 1999), the prisoner argued that his counsel was ineffective by referring to the crime as "brutal" and "savage" in closing argument at the guilt phase of trial. Each of the two defense attorneys gave a closing argument at the guilt phase of trial. One closing argument was aimed at convincing the jury that the crime was

murder, but not capital murder.  The lawyer argued at length that the State had not proven that the murder was conducted in the course of a robbery, sexual assault, or kidnaping.  He then closed with the following remarks:

> [T]his is not a capital murder case.  This is a very brutal, a very savage murder, but this is not a capital murder case by which [the defendant] needs to be put on death row.  I ask you that after you weigh the evidence, you apply it to the law as contained in the Court's charge.  I think you will agree with me that this is not a capital case, and the only thing this boy is guilty of is a brutal, brutal murder.  He does not deserve to be put on death row for what he has done.  The law provides a punishment for what he's done.  And we're going to expect you to punish him for what he's done, but he is—does not belong on death row.  And I ask that you re-enforce [sic] your feelings by your verdict of "not guilty" to capital murder.  Thank you.

*Id.* at 704.  The Fifth Circuit concluded that viewed in context, it was clear that the lawyer characterized the murder as brutal and savage to bolster his credibility with the jury.  It was a strategic decision they would not second-guess.

Similarly, Becker sought to bolster his credibility with the jury by acknowledging that Berg had pleaded guilty to a despicable crime.  During his closing argument, Becker reminded the jury that several of Berg's friends, neighbors, and coworkers had come to speak on his behalf.  These witnesses testified that they knew the nature of Berg's offenses, but they did not believe Berg posed a threat.  Becker argued that it is more difficult to admit to being a child molester than a murderer and that the social stigma of child abuse makes it the worst crime to admit.  At the state habeas proceeding, Becker clarified that he was not saying that aggravated sexual assault of child was the worst crime in a legal sense, but in the stigma it evokes.  Becker wanted to show the jury that despite the highly disturbing nature of the crime, several members of the community were willing to testify on Berg's behalf.  Becker's primary goal throughout the trial was to show that Berg was remorseful,

would not be a threat in the future, and should be placed on probation.  Becker did not want to alienate the jury by minimizing the seriousness of the crimes Berg had committed.  Becker made a tactical choice during closing argument about how to describe Berg's offense.

These are strategic decisions.  They were objectively reasonable, based on this record.  And Berg has not demonstrated that there was a reasonable probability that the outcome would have been different had Becker not referred to Berg's offense as the worst crime of all.

This court cannot find the state trial court's decision not to grant habeas relief for the ineffective-assistance-of-counsel claim objectively unreasonable.  Habeas relief cannot be granted on this claim.

### 4.    The Prejudice Prong of the *Strickland* Analysis

In the state sentencing context, the relevant inquiry is whether, absent counsel's errors, there is a reasonable probability that the defendant's sentence would have been "significantly less harsh," taking into account "such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances." *Dale v. Quarterman,* 553 F.3d 876, 880 (5th Cir. 2008) (internal quotation and citation omitted); *Spriggs v. Collins,* 993 F.2d 85, 88-89 (5th Cir. 1993).  Berg does not allege facts that establish prejudice in this instance and the record does not disclose any.  Berg was charged with aggravated sexual assault of a child, which is a first-degree felony. *See* TEX. PENAL CODE § 22.011(f).  Berg faced a potential range of imprisonment of "not more than 99 years or less than 5 years." TEX. PENAL CODE § 12.32.

In *Ward v. Dretke*, 420 F.3d 479 (5th Cir. 2005), the Fifth Circuit stated:

> Insulated from all potentially inadmissible evidence and prejudicial statements, the jury would still have heard testimony that Ward took impressionable boys into his confidence—showering them with attention, gifts, and encouragement—only to commit inexcusable depredations, including sexual assault and aggravated sexual assault.

Our society does not deal lightly with these sorts of sexual predators; nonetheless, the jury in this case sentenced Ward to 60 years when a sentence of 99 years or life was available.  Given the seriousness of the offenses to which Ward pleaded guilty, a reasonable possibility exists that he may receive a *more harsh* sentence if he were granted a new trial as to punishment.  In short, looking as we must through the prism of AEDPA deference, we decline to disturb the state habeas court's determination that Ward was not prejudiced.

Similarly, in light of the serious offenses he committed, Berg's 35-year prison sentences were not excessive.  The only mitigating evidence that Berg could muster was that he was not violent and he had made progress in sex-offender therapy.

The State, by contrast, presented significant aggravating evidence in this case.  During the punishment phase of the proceeding, two 13-year-old boys, G.L. and D.F., testified about how Berg sexually assaulted them at his home over a period of years.  Berg had been molesting young boys since he was 18 years old.

The record does not show that Berg's sentence would have been significantly less harsh if Becker had not asked certain questions during voir dire, presented the double-edged testimony of Dr. Edd, or made the challenged statement in closing argument.  Becker presented favorable testimony from Berg that included information about his work history and his suitability for probation or a lower sentence than the State sought.  Becker cited Berg's acceptance of responsibility, his remorse, and his lack of a criminal record.  Berg does not allege or show that his attorney had any other valid defense to pursue.  Berg does not otherwise show that another strategy would have resulted in a sentence that was "significantly less harsh." *Spriggs v. Collins,* 993 F.2d 85, 88-89 (5th Cir. 1993).  Berg fails to establish actual prejudice or to show that the state court's decision to reject his claim was objectively unreasonable under *Strickland.*  Berg fails to show that he was denied effective assistance of counsel during the punishment phase or that the state court's decision to deny this claim was objectively unreasonable.

Berg is not entitled to habeas relief.

## V.     Conclusion

The respondent's motion to dismiss, (Docket Entry No. 10), is granted.  Berg's petition for a writ of habeas corpus is denied.  This case is dismissed.  Any remaining pending motions are denied as moot.

Under the AEDPA, a petitioner must obtain a certificate of appealability before appealing the district court's denial of habeas relief.  28 U.S.C. § 2253(c)(2).  "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'"  *Miller-El v. Cockrell*, 537 U.S. 322 (2003)(citing 28 U.S.C. § 2253(c)(1)).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal."  *Id.* (citing *Slack v. McDaniel*, 529 U.S. 473, 482 (2000); *Hohn v. United States*, 524 U.S. 236, 248 (1998)).  A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted).

The analysis "requires an overview of the claims in the habeas petition and a general assessment of their merits."  *Miller-El*, 123 S. Ct. at 1039.  The court must look to the district court's application of AEDPA to the petitioner's constitutional claims and determine whether the court's resolution was debatable among reasonable jurists.  *Id.*  "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims."  *Id.*  Rather, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong.'" *Id.* at 1040 (citing *Slack v. McDaniel,* 529 U.S. 473, 484).   A district court may deny a certificate of appealability on its own without requiring further briefing or argument. *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000).  Berg has not made "a substantial showing of the denial of a constitutional right."   Therefore, a certificate of appealability from this decision will not issue.

SIGNED on March 23, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge